UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

        -against-              **SENTENCING MEMORANDUM**

JOSEPH CELSO,                    22-CR-194-3(EK)

        Defendant.

------------------------------------x

ERIC KOMITEE, United States District Judge:

      Joseph Celso was indicted alongside Anthony Romanello in a three-count indictment. A jury convicted them both of conspiring to participate in the use of extortionate means to collect on one or more extensions of credit (Count One). Romanello was convicted of the underlying substantive crime (Count Two); Celso was acquitted on that charge. The jury also acquitted Celso on the charge of obstructing a federal grand jury investigation (Count Three).

      At Celso's initial sentencing proceeding on April 30, 2024, he argued for two changes to the Sentencing Guidelines calculation set out in his Presentence Investigation Report: he seeks a two-point reduction in his offense level under the so-called zero-point offender provision, and to preclude the two-point enhancement for obstruction of justice. See U.S.S.G. §§ 4C1.1 (Zero-Point Offenders); 3C1.1 (Obstruction).

Celso's arguments were made out-of-time: his objections to the PSR were due on March 7, and his sentencing submission on April 15. Nonetheless, I proceed to consider both arguments. For the reasons set forth below, I find that Celso does not qualify for the zero-point offender adjustment, and that the obstruction enhancement does apply.[1]

## I.   Zero Point Offender

In November 2023, the Sentencing Commission adopted certain amendments to the Guidelines. One of those — codified at U.S.S.G. § 4C1.1 — confers a two-level reduction on a defendant who has no criminal history points *and* meets a series of additional criteria. One such criterion is that the defendant "did not use violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3).

There are three ways in which Celso could be said to have used violence, or the credible threat thereof, in connection with the offense of conviction: through the actions of his co-conspirator (Romanello), through his own threatening conduct towards the extortion victim, and via the threats of violence that Celso made to the victim's brother.

---

[1] The court sentenced Celso on May 7, 2024, in accordance with the Guidelines-related determinations set out in this order. At sentencing, I indicated that an order memorializing the reasoning would follow.

A.   **The Conspiracy with Romanello**

I first consider whether Celso could have used violence, or the credible threat thereof, via the conspiracy he entered into with Romanello. That conspiracy contemplated the use of force, or the threat thereof, as its object: per the indictment, Celso and Romanello conspired "to participate in the use of extortionate means to collect one or more extensions of credit." Indictment, ECF No. 1, ¶ 1. "Extortionate means" are "[a]ny means which involves the use or an express or implicit threat or use of violence or other criminal means to cause harm to the person, reputation or property of any individual." *United States v. Pacione*, 738 F.2d 567, 572 (2d Cir. 1984); *see also* Leonard B. Sand et al, Modern Federal Jury Instructions - Criminal, § 32.02, at Instruction 32-8 (2023).

The government demonstrated at trial that Romanello punched "Bruno" Selimaj, the individual from whom Romanello and Celso sought to collect a gambling debt. The jury concluded that this punch was *employed as a means* to collect. *See* Trial Transcript ("Trial Tr."), ECF Nos. 120, 121, 127, 128, 135, 136, at 862:17-863:5 (jury instructions on extortionate collection of credit). And the trial evidence made clear that this act of violence was the product of the conspiracy charged in Count One.

That raises the question – does a defendant who conspires to use violence and the threat of violence also "use"

3

those means himself?  The plain-English approach might support an affirmative answer: Black's Law Dictionary, for example, defines "use" (the noun) broadly, as "the application or employment of something."  *Use*, BLACK'S LAW DICTIONARY (8th ed. 2004).  Here, Celso agreed to employ violence, and the threat thereof, and his co-conspirator put that agreement into practice.

On the other hand, a disparity in how Section 4C1.1's various subsections are phrased suggests otherwise.  Section 4C1.1(a)(3) is keyed to the defendant's own conduct: "the defendant did not use violence or credible threats of violence."  This reference to the defendant's own conduct presents a notable contrast with the following subsection: Section 4C1.1(a)(4) speaks to consequences resulting from "the offense," rather than the defendant's own actions.  *See* U.S.S.G. § 4C1.1(a)(4) (defendant must show that "the offense did not result in death or serious bodily injury").

One court has read this disparity to indicate that the 4C1.1(a)(3) "inquiry turns on the actions of the defendant himself or herself, not the actions of others."  *United States v. Yang*, No. 23-CR-100, 2024 WL 519962, *4 (D.D.C. Feb. 9, 2024); *see also id.* at *4 n.5 ("[T]he defendant-specific

language in § 4C1.1(a)(3) would appear to preclude reliance on a group-based theory of liability as to this provision.").[2]

The court in *Yang* noted that the Guidelines provision defining Relevant Conduct — Section 1B1.3 — expressly directs consideration of the acts of co-conspirators that are within the scope of a conspiracy when applying Guidelines in Chapters 2 and 3. But it does not do that for Chapter 4, where the zero-point offender is codified. As to Chapter Four, the Relevant Conduct provision directs that "the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines." *Id.* § 1B1.3(b).

For this reason, I decline to conclude that Celso "used" force or the threat of force by *conspiring* to employ such means, where the government has not adduced evidence that Celso employed such means himself in furtherance of the debt-collection effort.

## B.   Celso's Own Conduct on May 11, 2017

The second way in which Celso might be said to have used violence, or the credible threat of it, is through his own conduct in Bruno's restaurant on May 11, 2017 — the day that Romanello punched Bruno Selimaj. At trial, the government introduced a video recording of that altercation. The video,

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

5

which has no sound, shows Romanello punch Bruno in the bar area of the restaurant, in plain view of employees and patrons. Government's Trial Exhibit ("GX") 313, at 05:51.

Before the discussion turned violent, Celso was seen leaning against a wall in the bar area, approximately twelve to thirteen feet from the discussion between Romanello and Bruno (and a third individual). *See* Trial Tr. at 196:8-10. Moments *before* Romanello throws the punch — as the discussion appears to rise in intensity — Celso begins walking towards Romanello and Bruno. GX 313 at 05:48. Celso is seen passing Romanello's right side and coming around to Bruno's left. *Id.* at 5:53. The government refers to this act as Celso "swarming" the victim. Gov't. May 13 Ltr., ECF No. 192, at 3. The PSR describes Celso and Romanello's associates as having "surrounded" Bruno. Presentence Investigation Report ("PSR"), ECF No. 153, ¶ 21. This is an apt description. The video then shows Bruno backing away from Celso and the others as they continue to walk towards him across the room. *Id.* at 05:56-06:04; PSR ¶ 21. Bruno testified (and the video supports) that as he was backing away from this group, he pointed out the restaurant's video cameras, which prompted Romanello, Celso, and their compatriots to leave. Trial Tr. at 112:8-16.

Celso's conduct on the video is perhaps ambiguous when considered in isolation. But considering the video together

6

with Bruno's testimony and the totality of the evidence at trial — including Bruno's knowledge that more than one of the people with Celso were associated with the Genovese crime family — I cannot say that Celso has carried *his burden* of showing that he did not employ the threat of violence himself.[3]  (Indeed, I find the opposite more likely than not: that Celso did credibly threaten violence through his actions in the restaurant.[4])  A credible threat need not be explicit.  A sentencing court may "infer[] a threat" from the defendant's conduct and the surrounding circumstances.  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 83 (2d Cir. 2018); *see also United States v. Johnson*, 64 F.4th 1348, 1352 (D.C. Cir. 2023) (sentencing courts properly review "contextual evidence" to determine whether a threat is credible).

Here, the video evidence shows Celso and three other men surround the individual from whom they sought to collect money.  This occurred in the wake of an actual assault.  Under

---

[3] "Generally, under the Sentencing Guidelines, a defendant who seeks to take advantage of a sentencing adjustment carries the burden of proof." *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997); *see also Yang*, 2024 WL 519962, at *2 (noting that defendant bears the burden under Section 4C1.1).

[4] Celso does not dispute that he and Romanello were both "inducted members of the Genovese organized crime family of La Cosa Nostra, an organization with a well-documented history of and reputation for violence." PSR ¶ 7.  The trial testimony revealed that Bruno was aware that Romanello and one other person present with Celso on May 11 were "mafia."  Trial Tr. at 65:13-14.

7

the circumstances, Celso's actions carried the implied threat of potential violence.[5]

**C.   Celso's Threats to Nino**

The third way in which Celso might be said to have employed a threat of violence is through the threats he made to Bruno's brother, "Nino" Selimaj.  Nino — a gambler himself, who had a prior relationship with Celso — testified that after his brother told him about the incident at the restaurant, he called Celso, who agreed to meet with him.  Trial Tr. at 250:24-251:5; 253:5-11.

At the ensuing meeting, Celso told Nino that the "[m]oney must be paid."  *Id.* at 253:8-14.  When Nino acknowledged that Bruno had filed a police report about the events of May 11, Celso replied that Bruno had "better drop the charges" — that is, "withdraw the police report."  *Id.* at 253:19-20.  "Otherwise," Nino recalled Celso saying, "it's going to be ugly."  *Id.* at 253:21-22.  Bruno did subsequently withdraw his complaint to the N.Y.P.D.  *Id.* at 255:12-13.  And Nino went on to collect the debt at issue and pay it to Celso.  *Id.* at 256:7-20.

Celso's threat — that if Bruno did not withdraw his complaint, things would get "ugly" — was "in connection with"

---

[5] Whether Celso actually intended to harm Bruno is of course beside the point — "a threat is a threat, even if the speaker never intends to carry it out." *Johnson*, 64 F.4th at 1352.

8

the offense of conviction, as Section 4C1.1(a)(3) requires. Celso acknowledged as much at the (continued) sentencing proceeding on May 7.

And this is consistent with settled law. The Supreme Court "has often recognized" — albeit in civil cases — "that 'in connection with' can bear a broad interpretation" and is a "capacious phrase." *Mont v. United States*, 139 S. Ct. 1826, 1832-1833 (2019) (collecting cases). Interpreting the same phrase in the Sentencing Guidelines, the Second Circuit opined that "in connection with" "should be construed as equivalent to the 'in relation to' language" of 18 U.S.C. § 924(c)(1), which penalizes using or carrying a firearm "during and in relation to" a crime of violence. That, too, is a broad construction: so construed, the appeals court held, "in connection with" required the government to demonstrate only "that the firearm served *some purpose* with respect to the felonious conduct." *United States v. Spurgeon*, 117 F.3d 641, 643-44 (2d Cir. 1997).

Likewise, in *United States v. Ryan*, 935 F.3d 40, 42 (2d Cir. 2019), the Second Circuit held that the enhancement in U.S.S.G. § 2K2.1 — for the use of a firearm "in connection with" another felony offense — applied to a defendant who had sold heroin and a shotgun to a confidential informant. The defendant argued that the enhancement did not apply because the gun "was not used to help sell the heroin." *Ryan*, 935 F.3d at 42. The

9

court disagreed, writing that "selling the shotgun could serve some purpose with respect to the simultaneous sale of heroin." *Id.* The "selling [of] firearms and drugs in the same transaction" the court reasoned, can help facilitate demand for narcotics by "sweetening the pot" and "lowering overall costs." *Id.* at 42-43.  Thus, packaging the two items together would "normally facilitate both the drug sale and future drug sales, and that [was] enough to trigger the enhancement." *Id.* at 42.

As is apparent, this is a relatively lenient standard. As long as the firearm in *Ryan* served some purpose — there, to "shore up" the heroin sale — the district court was free to conclude that the "firearm's presence" was not "merely coincidental to" the separate offense of narcotics trafficking, and to apply the "in connection with" enhancement. *Id.* at 42-43.

So: Act A is done "in connection with" Act B when Act A "served some purpose with respect to" Act B.  Here, the obstruction clearly served a purpose with respect to the extortionate collection of credit — it served to minimize the likelihood of arrest and prosecution *and* to encourage Bruno Selimaj to pay.  To the extent Bruno no longer felt safe going to the police for protection, he was left with only two options:

10

pay the debt, or face the risk of physical harm.[6] As in *Ryan*, the threat served to "shore up" the extortion conspiracy by minimizing the likelihood of police intervention.

## II. Obstruction / Acquitted Conduct

The PSR's Guidelines calculation includes the enhancement under U.S.S.G. § 3C1.1 for "obstructing or impeding the administration of justice." Celso argues that this enhancement should not apply because he was acquitted of the obstruction charged in Count Three — that is, obstructing the investigation of a grand jury sitting in this District. The government responds that the enhancement applies based both the acquitted conduct and other, *uncharged* acts of obstruction: namely, Celso's effort to pressure Nino Selimaj to convince his brother to withdraw his complaint to the N.Y.P.D.[7]

On April 30, the Sentencing Commission adopted several proposed amendments to the Guidelines. United States Sentencing Commission, Amendments to the Sentencing Guidelines, April 30, 2024 (the "April 30 Amendments").[8] One such amendment would alter the definition of "Relevant Conduct" offered in Section

---

[6] Bruno testified that he withdrew the police report because "I was afraid that this Mafia guy they gonna hurt me or my brothers or my nephew or my niece." Trial Tr. at 143:18-19.

[7] Celso's counsel agreed on the record on May 7 that this act of obstruction was not charged in the indictment.

[8] *See* https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202405_Amendments.pdf.

11

1B1.3 by excluding "conduct for which the defendant was criminally charged and acquitted in federal court." *Id.* at 1. That change is not yet effective; it will not become effective until November 1, 2024, and even then only if it is not "otherwise modified or disapproved by Act of Congress." 28 U.S.C. § 994(p).

Celso wants it applied anyway: "the winds of change are among us," he writes. Celso's Supp. Sentencing Memo., ECF No. 190, at 10. But the problem for Celso is that, as the government points out, the evidence at trial revealed conduct constituting obstruction that was *not* the subject of the count on which Celso was acquitted. As discussed above, Nino Selimaj testified at trial that Celso communicated a threat to him to get Bruno to drop the police complaint he filed after he was punched by Romanello. Trial Tr. at 253:12-22.

The Guidelines' commentary provides a "non-exhaustive list of examples of the type of conduct" that Section 3C1.1 applies to. U.S.S.G. § 3C1.1 cmt. 4. One of those examples is "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction." *Id.* Here, the evidence showed that Celso threated Nino — and, through him, Bruno — in order to have Bruno withdraw his report to the police of the defendant's conduct at

12

Bruno's restaurant. Based on this conduct — for which Celso was *not* acquitted — the obstruction enhancement applies.[9]

       SO ORDERED.

                              /s/ Eric Komitee
                              ERIC KOMITEE
                              United States District Judge

Dated:     May 22, 2024
            Brooklyn, New York

---

[9] Even if the obstruction enhancement did not apply, the court could consider the acquitted conduct itself in the 3553(a) analysis. The Sentencing Commission recognizes as much. April 30 Amendments, at 2 ("Nonetheless, nothing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661.").